UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN M. MORAN<br>NORA F. MORAN | )<br>)<br>) |
| | ) Civ. No. _____ |
| v. | )<br>05 - 1 1 0 9 2 RCL |
| UNITED STATES OF AMERICA | )<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTIONS OF
## JOHN M. MORAN AND NORA F. MORAN TO VACATE SENTENCES
## PURSUANT TO 28 U.S.C. §2255

John M. Moran and Nora F. Moran, codefendants in *United States v. Moran*, Crim. No. 96-

10335-RCL, have moved, pursuant to 28 U.S.C. §2255, to vacate the sentences they are currently

serving, based upon the ineffectiveness of their trial counsel in failing to file timely motions for new

trials pursuant to Fed. R. Crim. P. 33. They contend that their attorneys' failure to so move, in

conjunction with the motions for judgments of acquittal pursuant to Fed. R. Crim. P. 29 which their

attorneys did file on their behalf, denied them the effective assistance of counsel guaranteed them

by the Sixth Amendment to the United States Constitution. The failure of their attorneys to file

timely motions for new trials, and, in particular, to request that the Court conditionally order that the

Morans be granted new trials, as permitted by Rules 29(d)(1), (3)(A), in the event that the First

Circuit, as it did, reversed the Court's entry of judgments of acquittal "fell below an objective

standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Absent that error,

there is "a reasonable probability that . . . the result of the proceeding would have been different,"

*id.* at 694, as, having granted the Morans' motions for judgments of acquittal based upon the insufficiency of the evidence, it seems highly likely that the Court would also have conditionally granted them new trials in the event that the First Circuit reinstated their convictions. Moreover, it would have been within the Court's discretion to do so, even after taking into account the opinions of the First Circuit in the Morans' appeals. For all the reasons addressed herein, the Morans' convictions should be vacated and new trials granted.

## I.    PROCEDURAL HISTORY AND BACKGROUND.

### A.    Trial and Post-Trial Proceedings.

John and Nora Moran were charged with conspiracy to commit bank fraud (Count One) and two counts of substantive bank fraud (Counts Two and Three); Nora Moran was charged in Count Four with an additional bank fraud offense.[1]

The indictment arose from the circumstances under which 1st American Bank for Savings ("the Bank") . . . made two loans, in December, 1986, to Boston-area real estate developers, Edgard Puente and David Boersner . . . . The loans, in the aggregate of about $17 million, were made to finance the purchase by Puente and Boersner of certain buildings in Boston and the conversion of those buildings into multiple-unit condominium developments. At the time the loans were made, John Moran was an attorney for the Bank, who represented the Bank at the closing of the Puente/Boersner loans. Nora Moran, at the times the loans were made, was a member of the Board of Directors of the Bank. In summary, the indictment (with all counts considered together) charged – and the government's theory at trial was – that the defendants conspired to, and did, perform acts which caused the loans to be made, without disclosing to the Bank – and, in fact, concealing from the Bank – that (1) John Moran had an agreement with Puente and Boersner by which John Moran received, at the closing of the loans, a mortgage brokerage fee for placing the loans with the Bank and (2) that the Morans, through a business trust called Moran Development Group . . . held an interest in the potential profits from the sale of condominium units in the two projects for which the Puente/Boersner loans were made.

Memorandum and Order on Defendants' Motion for Judgment of Acquittal, July 13, 2000

("Memorandum and Order") at 1-2.

---

[1]

Hereinafter, to avoid confusion, John Moran will be referred to as "John," and Nora Moran will be referred to as "Nora."

The case was tried in May-July, 1999. At the close of the government's case, both John and Nora Moran moved for judgments of acquittal on all counts; the Court denied the motions as to Counts One through Three, but granted Nora's motion as to Count Four. Thereafter, John presented a defense, during which he testified on his own behalf; Nora presented the testimony of a expert witness in her defense. The government introduced rebuttal evidence relating to John's testimony. Both John and Nora renewed their motions for judgments of acquittal at the close of all the evidence, and the Court reserved its ruling. On July 14, 1999, the jury returned verdicts of guilty on all counts.

On July 15, 1999, John and Nora, in a joint motion, again sought the entry of judgments of acquittal and requested additional time to file memoranda in support of their requests. However, counsel inadvertently omitted to include an alternative request for new trials. On September 15, 1999, counsel for both John and Nora filed separate supplemental memoranda in support of their clients' judgment-of-acquittal motions in which, having become aware of their omission, they alternatively sought new trials under Rule 33 on behalf of their clients. On July 13, 2000, the Court ordered the entry of judgments of acquittal on all counts for both John and Nora, taking no action on the new-trial motions.

## B.    This Court's Memorandum and Order of July 13, 2000.

The Court, concluding that it had "too hastily" denied the defendants' Rule 29 motions made at the close of the government's case, reconsidered that denial and, based upon the evidence as it stood at the end of the government's case, ruled that the evidence was insufficient to support John and Nora's convictions. It therefore granted judgments of acquittal as to both John and Nora on all counts. *See* Memorandum and Order at 5-7.

3

### 1.    Counts Two and Three: John Moran.

Under the theory on which the government proceeded at trial, the government "was required

to prove beyond a reasonable doubt in counts 2 and 3 that John Moran deliberately failed to disclose

(that is, he concealed) from the Bank his economic interests in the Puente/Boersner loans before or

at the time the loans were made." Memorandum and Order at 33. As the Court correctly noted, the

government's evidence as to this essential component of its case rested on (1) the testimony of

Edmund Noke, and (2) the absence from the Bank files of any document reflecting that John had

disclosed his interests in the transaction to the Bank. *Id.* As to the former, the Court noted that, while

Noke testified on direct examination that neither John nor anyone else informed him of John's

interest in the Puente/Boersner loans,[2] he admitted on cross-examination that he had no independent

memory whatsoever of the loans or of what John or Puente or Boersner may or may not have said

to him in conjunction with them. Indeed, he did not even recognize John in the courthouse. *Id.* at 34.

"Noke said that his testimony about the circumstances of the Puente/Boersner loans was based only

on what he found and did not find in the Bank's records he reviewed before and during trial. Without

those records, Noke said, he was at a loss insofar as concerns any testimony he could give about the

Puente/Boersner loan transactions." *Id.* at 34-35.[3]

---

[2]

As the Court noted, Noke also testified on direct that he had no memory of ever meeting
Puente and Boersner, even though it had been his practice to meet with any borrowers whose loan
applications were assigned to him; he also had no memory of visiting the properties with respect to
which the loans were to be made, even though it was also his practice to visit properties to be used
as collateral for loans. *See id.* at 34.

[3]

As the Court noted, although neither of the two one-page memoranda which Noke prepared
for the executive committee's consideration of the Puente/Boersner loans mentions John's interests
in them, Noke testified that disclosures of interests such as those at issue in this case would not have
been made in memoranda of that type in any event. *See id.* at 35 n.8. The absence of any reference
in these documents to John's interests in the loans provides, therefore, no evidence that John did not
disclose his interests to Noke.

4

The jury could have, the Court concluded, found from Noke's direct and redirect testimony and from the evidence regarding Nora's trusteeship of Moran Development Group ("MDG"), which held John's interest in the profits from the condominium projects, that the Puente/Boersner loans should have been listed by Noke on his required monthly reports regarding "insider loans." *Id.* at 35-36. The jury could have further found, the Court continued, "that, had John Moran disclosed his interests in these loans, Noke would have included the loans on one of the monthly lists of insider loans he prepared for his superiors at the Bank, or that Noke would have prepared other documentation of John Moran's interests in the Puente/Boersner loans." *Id.* at 36. The fatal problem for the government's case lay, however, the Court found, in the Bank's documented history of shoddy recordkeeping practices and the government's complete failure of proof regarding the care, custody, and control of the Bank's records during the crucial October, 1986, to early 1988 time period:

> [T]hese conclusions, without more about the Bank's records, are an insufficient basis for a conviction of John Moran of bank fraud. To put the matter another way, in the absence of any independent recollection by Noke of the Puente/Boersner loans, the government's bank fraud case against John Moran rises or falls on the state of the Bank's records. (Noke was the only employee of the Bank to whom John Moran claimed to have disclosed his economic interests in the Puente/Boersner loans.) The position of the government, therefore, comes to this: if John Moran had disclosed to Noke his interests in the Puente/Boersner loans, Noke would have documented the fact that the loans were insider transactions; no document exists in the Bank records to reflect any disclosure by John Moran; accordingly, John Moran did not make the disclosure.

> The problem for the government, however, is that its reliance on the Bank's records and evidence of Noke's and the Bank's customs and practices with respect to insider loans required more evidence about the Bank's recordkeeping than the government produced. For example, the government produced no evidence about how and where the "monthly lists" or other documentation of insider loans (to which Noke referred) were maintained. All that Noke said about the "monthly lists," was that "we would get a sheet, and we would have to write down on the sheet [any insider loan], and we sent it up to *whoever controlled that.*" . . . There was no evidence from the government, however, to identify "whoever controlled that," or what that person (or those persons) did with the "sheet."

> Furthermore, any memorandum that Noke made concerning his discussions with John

Moran, Puente, Boersner or any other person concerning the Puente-Boersner loans would have been made during the period October through December 1986, the period from the time of John Moran's first approach to Noke about the Puente/Boersner loans to the time the loans were closed. Hanson testified that, when he reviewed the files on the Puente/Boersner loans in early 1988, after the loans had ceased to perform, he found no documents indicating that John Moran had disclosed to Noke (or anyone at the Bank) that John Moran had economic interests in the Puente/Boersner loans. In addition, the government offered evidence that the FDIC examined the Bank's records up to the time of trial in the same state in which the records had been received when the FDIC closed the Bank and seized its records in October, 1990. Thus, the government's evidence gave an account of the state of the Bank's records as to the Puente/Boersner loans between the period beginning in early 1988 and ending at the time of trial. The government, however, *did not* offer evidence as to the custody and disposition of the Bank's records with respect to the Puente/Boersner loans (i.e., what happened to the records) . . . between October, 1986 and early 1988 – a period of about fourteen months that was critical in the life of the Puente/Boersner loans.

*Id.* at 37-38 (first emphasis added by Court; second emphasis in original).

The failure of the government's proof was "especially problematic," the Court reasoned, "in

light of undisputed evidence concerning significant deficiencies in the recordkeeping practices of

the Bank in general and of Noke in particular." *Id.* at 38. Deficiencies noted with respect to the Bank

by bank examiners in August, 1986, included:

- "Loan documentation was found to be less than satisfactory for commercial and construction loans, including the bank's joint venture projects. Files were often incomplete and disorganized or difficult to locate."

- "[L]oan officer memos were either non-existent or not current."

- "Commercial mortgage files and joint venture investment files were found to lack centralization and organization of documentation and pertinent information."

- "[S]erious operational deficiencies . . . include . . . poor administrative procedures in reports to the Board of Directors."

Ex. 97, *quoted in* Memorandum and Order at 39-40.[4] These deficiencies persisted through June,

1987, as indicated in a report of the Bank's internal audit department:

---

4

These deficiencies were so severe that the bank examiners concluded in August, 1988, that they were one cause of the Bank's financial deterioration. *See id.* at 40-41.

Our findings indicated that documentation controls were found to be minimal on all Joint Ventures tested. In one case, the original note could not be located. In other cases, insurance coverage documentation, requisitions, appraisals, construction contracts and document check lists were noted as missing. On two of the projects, original notes were found in unsecured files.

Documentation of the Loan Officers review of the project was not noted in the files. Important communications from outside parties, including requisitions, inspections, and proposed changes were not addressed by the Loan officer in the files . . . No evidence was noted of physical inspection by loan officers in the files.

Ex. 99, *quoted in* Memorandum and Order at 40. The Court also pointed to other evidence of the inadequacies of the Bank's recordkeeping and documentation. Stanley Ragalevsky, an attorney who, at the Bank's request, investigated the relationship of the Morans to the Puente/Boersner loans, testified that the Bank "did not document their loans all that well in terms of file comments;" loan officers, he said, "might have done a much better job in explaining why things were done." *Id.* at 41. Michael Hanson, the Bank's vice-president and general counsel, testified that "when he looked at the files on the Puente/Boersner loans in early 1988, he found that there were many documents missing and there was really no closing record in the file at that time." *Id.* at 41 (internal quotation marks omitted).

Critically, Hanson found Noke to be "totally incompetent as a commercial lender." *Id.* Ragalevsky shared Hanson's opinion, testifying that Noke's performance as a commercial lender was "terrible." *Id.* at 42. So low was Ragalevsky's opinion of Noke's professional performance that he testified that "had John Moran made appropriate disclosures to Noke concerning John Moran's interests in the Puente/Boersner loans, [he] would not have been surprised if there were no documenting record in the files maintained by Noke on these loans." *Id.* at 42. Noke himself freely admitted that he had no background or experience in commercial lending and was "over his head."

*Id.* at 42 n.10.[5] Noke also admitted that in October - December, 1986, he had a problem with alcohol

abuse. *Id.* at 42 n.11.

Based upon its review of the evidence presented by the government in its case-in-chief, the

Court concluded:

[B]ecause the government's case that John Moran failed to make the appropriate disclosures about his interests in the Puente/Boersner loans depends, at bottom, on what the Bank records reveal or do not reveal as to any such disclosures, it was incumbent upon the government to produce evidence as to what happened to the records of the Puente/Boersner loan during the period October, 1986 through early 1988. When the government failed to produce such evidence, it failed to show that any document reflecting any disclosure by John Moran of his interests in the Puente/Boersner loans reasonably could have been expected to be among the Bank's records concerning these loans when Hanson examined those records in early 1998. Thus, viewing the evidence presented by the government (including all the inferences that reasonably could have been drawn from that evidence) in favor of the verdict, I conclude that the evidence is no more supportive of John Moran's having failed to disclose his interests in the Puente/Boersner loans than that he did make such disclosure, and that Noke noted the disclosure in writing, but Noke's notation was lost, misplaced, or even destroyed during the period October, 1986 to early 1988. In other words, the evidence gives equal or nearly equal support to John Moran's innocence of bank fraud as to his guilt of that offense.

*Id.* at 42-43 (internal quotation marks omitted).

## 2. Counts Two and Three: Nora Moran.

The Court found the evidence insufficient to support Nora Moran's convictions on Counts

Two and Three for several reasons. The first problem for the government, the Court concluded

lies . . . in the effect of the votes taken by the executive committee on December 17, 1986 to approve the Puente/Boersner loans. The uncontested evidence presented by the government was that the Bank's president or its vice-president in charge of lending activities could approve commercial loans up to a maximum of $500,000. All other loans were *approved* by the Bank's executive committee. . . . Nora Moran was not a member of the executive committee during the period October, 1986 to January 15, 1987. . . .

On December 17, 1986, the executive committee *approved* the Puente/Boersner

---

5

In this, Noke was apparently no exception to the Bank's general incompetence, as reflected in the August, 1988, Report of Examination's pointed criticism of the Bank's loan officers. *See id.* at 42 n.10.

8

loans. Thereafter, on December 18, 1986 and on December 24, 1986, the Bank *issued commitment letters* for the loans . . . . Ragalevsky testified, without contradiction, that generally when a bank signs and delivers a commitment letter to a borrower, the bank commits itself to make the loan to the borrower on the terms set forth in the commitment letter. . . . The loan for the West Rutland Square project *was closed on December 23, 1986*, and proceeds of approximately \$2.4 million were delivered to, or paid out on behalf of, Puente and Boersner at the closing. . . . The loan for the Commonwealth Avenue project *was closed on December 2[4], 1986*, and proceeds of \$7.8 million were delivered to, or paid out on behalf of, Puente and Boersner at the closing. . . .

Memorandum and Order at 52-53 (emphasis in original). Thus, the Court concluded, when Nora voted as a member of the Board of Directors on January 15, 1987, to accept the treasurer's summary report of the executive committee's December, 1986, lending activities, the Puente/Boersner loans had already been approved, committed to, and closed, and her vote, therefore, could not have had any effect on the decision of the Bank to make the loans or to distribute most of their proceeds. *See id.* at 53. "The evidence that the loan actually was approved and closed before the end of December, 1986, itself compels the conclusion that the government's evidence was insufficient to sustain, beyond a reasonable doubt, the essential element of the government's theory that the vote Nora Moran cast on January 15, 1987 was a vote to approve the Puente/Boersner loans." *Id.* at 54.

The second fatal defect in the government's proof, the Court continued, was its utter failure to prove that the Puente/Boersner loans were even included in the summary report which the board of directors was asked to accept on January 15, 1987. The minutes of the December 17, 1986, executive committee meeting indicate that it took two votes at that meeting – one to approve a group of 140 loans unrelated to the Puente/Boersner loans and one to approve another group of 13 loans, which did include the Puente/Boersner loans. *Id.* at 54-55. The summary presented to the board did not, however, include this latter group of 13 loans. *Id.* at 55. The Court rejected the government's argument that the 13 loans must have been presented to the board because that was the Bank's custom and practice because the contemporaneous records of the January 15, 1987, meeting

9

affirmatively demonstrate that the Bank's ususal custom and practice was *not* followed on that occasion. *Id.* at 56. "This state of the evidence provides an additional basis for a ruling that a reasonable jury could not have determined, beyond a reasonable doubt, that Nora Moran's vote to accept the treasurer's summary report on January 15, 1987 was a vote on a report that included the Puente/Boersner loans." *Id.* at 56.

Finally, the treasurer's summary report "only sets out broad categories (i.e., commercial loans, passbook loans, consumer loans), aggregate amounts, and numbers of loans approved in December, 1986 by the executive committee. . . . The summary does not identify any individual loan." *Id.* at 57. There was no evidence that Nora knew that the Puente/Boersner loans were included within the broad categories of loans described in the summary report. "Indeed, the government offered no evidence that Nora Moran knew that the Puente/Boersner loans had even been approved in December, 1986." *Id.* "The government's evidence therefore is insufficient to establish that any vote Nora Moran took on January 15, 1987 was *knowingly* cast to approve the Puente/Boersner loans." *Id.*

### 3.    Count One (Conspiracy): John and Nora Moran.

The Court concluded that judgments of acquittal should be entered for both John and Nora Moran on Count One because "[i]n the circumstances of this case and upon the theory of conspiracy pursued by the government, the failure to establish beyond a reasonable doubt that *either* defendant committed the substantive offenses was also a failure to establish beyond a reasonable doubt the agreement between them to commit the offense." Memorandum and Order at 60.

### C.    The Opinion of the First Circuit in *Moran I.*

On appeal, the First Circuit concluded that the Court erred in considering only the evidence presented by the government in its case-in-chief when ruling on the reserved judgment-of- acquittal

10

motions and that its appellate review of the sufficiency of the evidence should encompass the entire

trial record. *United States v. Moran*, 312 F.3d 480, 488 (1st Cir. 2002)("*Moran I*"). The Court then

canvassed the evidence and concluded that, considering the evidence in the light most favorable to

the government and drawing all reasonable inferences in favor of the verdict, a reasonable jury could

have found John and Nora Moran guilty of the offenses charged in Counts One - Three.

## 1.    Counts Two and Three: John Moran.

In reversing the judgments of acquittal entered for John Moran on Counts Two and Three,

the First Circuit placed substantial reliance on Noke's testimony and the inferences which it found

the jury could have drawn from that testimony:

> Noke . . . testified that he did not recall John Moran making any disclosures concerning his
> two-fold financial arrangement with Puente and Boersner. His lack of recollection is notable
> for two reasons: (1) circumstances where the bank's closing attorney also functioned as a
> mortgage broker for and co-partner with the bank's clients in the same transaction were rare,
> and the jury reasonably could have balanced this unusual circumstance against the fact that
> nothing about the Puente/Boersner loans stood out in Noke's mind; (2) insider arrangements
> of this nature typically triggered greater scrutiny and generated special paperwork.
> Accordingly, the absence of bank records documenting John Moran's outside arrangements
> was another factor that the jury could take into account in concluding that he had concealed
> the details of his relationship with Puente and Boersner.

*Moran I*, 312 F.3d at 489-90.[6] The Court also pointed to the rebuttal testimony of William Collins:

> The government discredited John Moran's testimony that he had disclosed his $100,000
> finder's fee from the November, 1986 loan for which he also represented First American at
> closing by calling in rebuttal the loan officer involved who, like Noke, did not recall John
> Moran making any disclosure of a conflict of interest. That testimony, coupled with the
> unique vantage of the jury to assess John Moran's demeanor and make key credibility
> determinations concerning his veracity and attention to detail as measured against the lack
> of independent corroboration for his testimony, permitted the jury, on balance, to disbelieve
> John Moran on the one hand and credit Noke on the other irrespective of any gaps or
> arguable inconsistencies in Noke's testimony.

---

[6]

The Court also found it significant that, although John testified at trial, he did not introduce
any documents evidencing his disclosure of his financial interests in the Puente/Boersner loans to
Noke. *Id.* at 490.

11

*Id.* at 490. Because the jury could conclude that John failed to make the required disclosure, the

Court continued, the record supported a conclusion that that failure was intentional and motivated

by a desire for financial gain at the potential expense of the Bank.

As an attorney for First American, John Moran was positioned uniquely to expedite the process by which Puente and Boersner could obtain financing for his development projects, for instance by by-passing conventional bureaucratic impediments to arrange critical meetings with bank loan officials and inspections of the properties. At the same time, as an experienced real estate attorney, John Moran was well aware that disclosure of his dual, conflicting broker-client relationship with the loan principals and of his direct interest in the profits generated by their development projects could jeopardize his stake in the venture. In fact, the considerable extent to which John Moran stood to benefit from the loans – $250,000 in broker fees and 20% of profits – is further probative of his motive to conceal facts that were potentially outcome-determinative with respect to approval of the loans.

*Id.* at 491. Finally, the Court focused on what it perceived as John's efforts to "eliminate a paper

trail" and "avert inquiry:"

John Moran recruited his wife to function as the only declarant-trustee on the MDG Trust which, being a Massachusetts Business Trust, does not disclose as a matter of public record the identity of its beneficiaries. Thus, John Moran was not clearly linked to the entity. When Puente and Boersner created the Boston Commonwealth Trust and the 76-82 Rutland Square Trust to collect the loan proceeds and take title to their properties, at John Moran's behest they designated MDG as a 20% beneficiary. However, there were no signatures of anyone purporting to represent MDG on the documents setting up the two trusts. Consequently, when a letter from an attorney for Puente and Boersner disclosed to First American that MDG was one of three beneficiaries of the trust that was taking title to the Commonwealth Avenue property, John Moran was insulated because the bank did not have information linking him to MDG. To further maintain his anonymity with respect to MDG, John Moran did not submit the customary post-closing settlement statements or any records regarding the trustees or beneficiaries of the MDG Trust.

*Id.* Based upon the foregoing, the Court concluded that "there was sufficient evidence to allow a

rational jury to conclude, beyond a reasonable doubt, that John Moran concealed his financial

arrangements with Puente and Boersner not as the product of a good faith, honest oversight but

rather pursuant to an affirmative endeavor calculated to defraud First American."*Id.* at 491-92.

## 2.    Counts Two and Three: Nora Moran.

The Court began its discussion of the sufficiency of the evidence issue as it related to Nora

Moran with the recognition that "the government's bank fraud case against Nora Moran was not as

strong as that against John Moran." *Id.* at 492. The Court agreed with this Court's assessment of the

nature of the vote taken at the January 15, 1987, board of directors meeting:

> [I]t is not clear that at the January 15, 1987 meeting of First American's Board of Directors,
> Nora Moran participated in a dispositive vote on the loans. Though the government advanced
> a theory that a vote was taken to ratify the Puente/Boersner loans, it appears that the Board
> rubber-stamped as a mere formality a summary report of the loans the Executive Committee
> had approved in December.

*Id.* The Court nonetheless concluded that there was sufficient evidence to support Nora's convictions

on two theories. First, it concluded,

> a rational trier of fact could have found that Nora Moran, who admitted to Ragalevsky and
> Adams that she was aware of her husband's outside dealings and arrangements concerning
> the projects prior to the consummation of the transactions at issue, chose not to disclose the
> conflicts to the appropriate bank officials in her capacity as bank director because she
> anticipated that a financial windfall would accrue to her husband (and by extension to her)
> should the loans be approved and feared that a disclosure would undermine the approval
> process.

*Id.* The Court pointed to evidence which it regarded as "significant evidence tending to establish

Nora Moran's knowing, active participation in the fraudulent scheme:"

> Nora Moran accompanied her husband, Puente, Boersner, Noke, and a construction inspector
> to visit the project sites in November 1986 before the loan applications were submitted as
> proposals or approved; a mere two days before the Executive Committee approved the loans,
> she signed the papers establishing the MDG Trust which functioned as a repository for the
> 20% interest in the profits generated by the Puente/Boersner development projects; John
> Moran's secretary . . . ordinarily served as trustee for his real estate transactions, suggesting
> that such a break from routine likely would have sparked a modicum of inquiry from Nora
> Moran as to the purpose for the formation of MDG; John and Nora Moran shared financial
> matters, including filing joint tax returns and transferring funds between their separate
> business ventures; and Nora Moran was an astute real estate broker and bank director
> familiar with the affirmative duties of disclosure governing fiduciaries when confronted with
> bank transactions that affected them personally.

*Id.* The Court concluded that there was a sufficient basis for the jury to convict Nora of bank fraud

because "the evidence supported a conclusion that Nora Moran knowingly executed the scheme to

defraud First American through her deceptive acts (for example, signing the trust documents for the

13

entity holding the 20% profit interest) and omissions (deliberately concealing information that might

have delayed or terminated the loan process)." *Id.* at 493.

Second, the Court concluded that the evidence supported Nora's conviction on an aiding and

abetting theory.

[E]ven if Nora Moran did not execute or attempt to execute the scheme, there was sufficient
evidence to conclude beyond a reasonable doubt that she wilfully aided and abetted John
Moran's fraud by associating herself with his venture and seeking by her actions to make it
succeed. . . . Furthermore, the evidence was sufficient on which to premise Nora Moran's
culpable state of mind for aiding and abetting liability to the extent that she consciously
shared her husband's knowledge of the underlying criminal scheme and intended to
participate in it for the purpose of bringing about financial gain.

*Id.* at 494.

In a separate concurring opinion, Judge Boudin disparaged the government's January 15,

1987, board meeting vote theory of Nora's criminal culpability as "hopeless." *Id.* at 496. With

respect to the government's alternative theories, non-disclosure and aiding and abetting, he stated

that proof that Nora had a criminally culpable state of mind required proof of four facts: "first, that

Nora knew of John's participation on both sides of the transaction; second, that she knew that John

had not disclosed his conflict of interest to the bank; third, that she knew that she had an obligation

to disclose John's position if John did not make the requisite disclosure; and fourth, that she acted

dishonestly rather than negligently in failing to disclose." *Id.* at 495. He found the second proposition

"doubtful" and the evidence relating to it "extremely thin." *Id.* If the second proposition were not

proven, he continued, then the fourth would fail as well. *Id.*

Although he concurred in the reversal of the judgments of acquittal, it is evident that Judge

Boudin was of the belief that a new trial might be warranted for Nora:

. . . . On remand, the new trial request and the government's objections remain to be
considered.

The district court, already disposed to grant an acquittal outright, may well be inclined to

14

grant a new trial on weight-of-the-evidence grounds, given the collapse of the government's primary voting theory and the thin factual support for the fraudulent non-disclosure claim against Nora.... This outcome might well be justified, assuming that Nora's arguments for the timeliness of the new trial motion can overcome the government's asserted objections.

*Id.* at 496.

### 3.    Count One: John and Nora Moran.

The Court concluded that the evidence was sufficient to support John and Nora's Count One bank fraud conspiracy convictions because "the evidence supported a conclusion that the Morans agreed to participate in a scheme to defraud First American for the common goal of pecuniary gain, knowingly and voluntarily participated in the conspiracy, and took at least one affirmative act in furtherance of the conspiracy." *Id.* at 494. In so concluding, the Court criticized this Court's analysis for its failure to "consider . . . that a defendant can be guilty of the inchoate offense of conspiracy even if he and his co-conspirator are not guilty of the underlying substantive offense so long as he knowingly entered an agreement to commit the substantive offense and participated in the plot to effectuate the offense; success is not a required element." *Id.* at 494 n.22.

### D.    Sentencing Proceedings.

#### 1.    John Moran.

In rejecting the government's position as to the guidelines loss calculation,[7] the Court expressed strong doubt as to the materiality of any nondisclosure of John's interests in the Puente/Boersner loans, pointing specifically to all the indicia of the Morans' involvement on documents related to the loans, which the Bank simply ignored:

I have no doubt that the bank would have made this loan to Puente and Boersner irrespective

---

[7]

  The Court concluded that the guidelines did not apply, as no act in furtherance of the charged bank fraud conspiracy took place after the effective date of the guidelines. It proceeded, however, to express its disagreement with a number of the positions taken by the government in its proposed guidelines calculations.

of the roles of the Morans. The bank had just gone public, it had all this money, $100 million it had to get on the street, and it needed to get that money on the street before the end of 1986, before the tax laws changed. [T]he bank was hell-bent to make loans like this, and so the bank made these loans. I don't think it . . . would have made a difference had . . . the Morans' interest . . . been disclosed as to whether the bank would have made this loan.

The reason I say that is the bank did very little to investigate the bona fide entities of these four owners. The borrowers had each of them net worth of no more than $500,000. That's all they had. They were borrowing a total of $17 million. The Morans – the name "Moran" appeared on the loan application innumerable times. For purposes of the jury determination, that didn't matter, but in terms of my thought about the bank's investigation of these loans, it seemed to me that if they had problems with the role of John Moran and Nora Moran, somebody who got these papers would have said wait a minute, there's a problem here, because the Morans or the name "Moran" appears on these papers, and we ought to ask John Moran, we ought to ask Nora Moran, they may have had their own independent obligation to tell us, and since they have not told us, we ought to ask them. . . .

Tr. 7/28/03 at 31-32. The Court was again critical of the bank's sloppiness and incompetence:

But even if I could say that the conduct of the Morans caused this loss in part, there are other factors as well. The bank's sloppiness, which I've already referred to in terms of investigating the loans. The bank's incomprehensibly bad record keeping, not just about these loans, but generally. The fact that the bank was incompetent and its officers were incompetent to make loans, that's clear from the record. . . .

*Id.* at 32. The Court also concluded that it could not find by a preponderance of the evidence that

John had testified untruthfully at trial. *Id.* at 34. The Court sentenced John to three years probation,

which he is currently serving.

### 2. Nora Moran.

The Court made the record in the sentencing of John Moran applicable to the sentencing of

Nora Moran as well. Tr. 7/28/03 at 3. The Court sentenced Nora Moran to two years probation,

which she is currently serving.

### E. The First Circuit's Opinion in *Moran II.*

On appeal, both John and Nora argued that the failure of their attorneys to file timely motions

for new trial constituted ineffective assistance of counsel. The First Circuit declined to consider the

issue on direct appeal, relying on its general rule that fact-specific ineffective assistance claims

should be litigated in the first instance in the district court. The Court also noted that "the insights

of the trier, who has seen and heard the witnesses at first hand and watched the dynamics of the trial

unfold, are often of great assistance." *United States v. Moran*, 393 F.3d 1, 10 (1st Cir. 2004)("*Moran*

*II*").

> This is such a case. No ineffective assistance claim surfaced in the district court, and the
> record is barren of evidence as to why the lawyers did what they did. There are both tactical
> and strategic reasons why a party might seek a judgment of acquittal but not a new trial (for
> example, a fear that the prosecution will learn from its mistakes and put in a more persuasive
> case the second time around, a fear that the decisionmaker will take a request for acquittal
> less seriously if a possible compromise – such as a new trial – is on the table, or a fear that
> a shift in judges will lead to a stiffer sentence). Although hindsight is always 20/20, we
> cannot tell from this record whether the decision not to seek a new trial, *when made*, was a
> calculated stratagem or a mere oversight. Factfinding will be required to make that
> determination, which means that the district court should hear the claim in the first instance.

*Id.* at 10-11 (emphasis in original). As to the prejudice prong of the *Strickland* inquiry, the Court

stated:

> [E]ven if the failure to ask for a new trial betokens objectively unreasonable (and, therefore,
> constitutionally deficient) performance on the part of the lawyers – a matter on which we
> take no view – it remains to be determined whether any such failure was prejudicial within
> the meaning of *Strickland*. A finding of prejudice here would require a subsidiary finding
> that, but for the error, the moving defendant probably would have received a new trial. . . .
> That question is not open and shut. Each defendant must independently demonstrate that,
> given the holding of this Court in *Moran I*, an objectively reasonable district court would
> likely have granted a new trial. . . . The nisi prius court is the proper forum in which the
> defendants may attempt to make this showing.

*Id.* at 11. The court added, in a footnote:

> The fact that the district court originally granted the defendant's motion for judgment of
> acquittal is not an infallible harbinger of how motions for new trial would fare. The district
> court's judgment, informed by the opinion in *Moran I*, may well be different. In any event,
> no less an authority than the Supreme Court has stated that in the ineffective assistance
> context, the idiosyncracies of the particular decisionmaker . . . are irrelevant to the prejudice
> inquiry.

*Id.* at 11 n.6.

## II. THE FAILURE OF THE MORANS' TRIAL COUNSEL TO FILE TIMELY MOTIONS FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33 DENIED THEM THEIR RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

### A.    Ineffective Assistance Generally.

To prevail on a claim that he was afforded constitutionally deficient assistance of counsel in violation of the Sixth Amendment, a defendant must make two showings. First, he "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The defendant must show "that his counsel's error clearly resulted from neglect or ignorance rather than from informed professional judgment." *Barrett v. United States*, 965 F.2d 1184, 1193 (1st Cir. 1992). The Sixth Amendment requires that counsel make "objectively reasonable choices," *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000); "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Id.* at 481. The reasonableness of counsel's acts or omissions must be evaluated from counsel's perspective at the time of the challenged act or omission. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Flores-Ortega*, 528 U.S. at 478; *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689; *Prou v. United States*, 199 F.3d 37, 48 (1st Cir. 1999); *United States v. Natanel*, 938 F.2d 302, 309-10 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992).

Second, the defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id. See, e.g., Tejeda v. DuBois*, 142 F.3d 18, 22 (1st Cir. 1998).[8] The *Strickland* standard

---

8

    In the wake of the Supreme Court's opinion in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), some courts, including the First Circuit, suggested that *Fretwell* added a third dimension to the *Strickland* standard: "whether the result of the proceeding was fundamentally unfair or unreliable."

is not a preponderance of the evidence standard, 466 U.S. 694, and a defendant "need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 694 (emphasis added).

## B.    The *Strickland* Standard As Applied To This Case.

### 1.    Counsel's failure to file timely motions for new trials fell below an objective standard of reasonableness.

As the affidavits of the Morans' trial counsel – Kenneth J. Fishman, Esq. for Nora Moran and Francis J. DiMento, Esq. for John Moran – attest, their failure to move for new trials pursuant to Rule 33 on the ground that the verdict was against the weight of the evidence was not the product of reasoned reflection or strategic judgment on the part of counsel. Quite the contrary – it was entirely the product of oversight. Mr. Fishman's office prepared a renewed motion for judgment of acquittal on behalf of both John and Nora Moran, which was filed on July 15, 1999, and which did not include an alternative request for a new trial. Affidavit of Kenneth J. Fishman ("Fishman Aff."), ¶4, appended hereto as Exhibit A. Mr. DiMento depended upon Mr. Fishman's office to file the appropriate post-trial motions on behalf of both John and Nora, as Mr. Fishman had agreed to do; Mr. DiMento assumed that those motions would include not only a renewal of the judgment-of-

---

*Scarpa v. DuBois*, 38 F.3d 1,16 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995), *quoting Fretwell*, 506 U.S. at 369. *See, e.g., Tejeda*, 142 F.3d at 22. In *Williams v. Taylor*, 529 U.S. 362 (2000), however, the Supreme Court made it clear that *Fretwell* does not require a separate inquiry into fairness or reliability when the defendant can demonstrate that his counsel was ineffective and that there is a reasonable probability that that ineffectiveness affected the outcome of the proceedings. *Id.* at 393-95. "Cases such as . . . *Fretwell* . . . do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him." *Id.* at 393 (emphasis in original). *See, e.g., Prou*, 199 F.3d at 49 n.7 (subject to the proviso that a defendant has no entitlement to the luck of a lawless decisionmaker, "the traditional *Strickland* 'prejudice' standard remains unchanged" by *Fretwell*). *See also Fretwell*, 506 U.S. at 373 (O'Connor, J., concurring)(stating that *Fretwell* will have no effect on the *Strickland* prejudice inquiry "in the vast majority of cases").

acquittal motions but also an alternative request for new trials, which he considered to be routine. Affidavit of Francis J. DiMento ("DiMento Aff."), ¶¶4-5, 12, appended hereto as Exhibit B. Mr. DiMento received a copy of the motion filed by Mr. Fishman's office but did not review it within seven days of the verdict. DiMento Aff., ¶6. Mr. DiMento became aware of the omission at some time prior to the September 15, 1999, date set for the filing of memoranda in support of the motions which had been filed on July 15, 1999, and included an alternative request for a new trial in the memorandum he filed on John Moran's behalf on September 15, 1999. DiMento Aff., ¶8. Mr. Fishman told him that the omission was inadvertent. DiMento Aff., ¶13. Mr. Fishman also included a request for a new trial in the memorandum he filed on behalf of Nora on September 15, 1999. Fishman Aff. ¶6, There was, both Mr. DiMento and Mr. Fishman have attested, no strategic reason or purpose for the omission of an alternative new trial request from the motion filed on July 15, 1999. DiMento Aff.,¶10; Fishman Aff., ¶7.

That counsel believed strongly that the evidence did not suffice to support the convictions of either John or Nora is evident from the vigor with which they argued evidentiary insufficiency at every possible opportunity. Given the somewhat more relaxed standard for granting new trials under Rule 33 based upon evidentiary deficiencies, counsel must perforce have believed that there was a solid basis for moving for a new trial under Rule 33 on the ground that the evidence preponderated so heavily against the verdict that a new trial should be granted in the interests of justice. *See* DiMento Aff., ¶11. [9] "A district court has greater power to order a new trial than to overturn a jury's

---

[9]

This is not, therefore, a case in which counsel's failure to move for a new trial can be found to have been reasonable based upon counsel's assessment that there were no viable grounds for the filing of a new trial motion. *See, e.g., United States v. Castillo*, 14 F.3d 802, 805 (2d Cir.), *cert. denied*, 513 U.S. 829 (1994); *Laird v. United States*, 987 F.2d 527, 530 (8th Cir. 1993); *Kamen v. United States*, 124 F.Supp.2d 603, 607 (M.D.Tenn. 2000). *See also Wilson v. Henry*, 185 F.3d 986, 992 (9th Cir. 1999).

20

verdict through a judgment of acquittal." *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986). Unlike when ruling on a motion for judgment of acquittal, in considering whether to exercise its discretion to order a new trial based upon the weight of the evidence, the district court does not view the evidence in the light most favorable to the government. *See, e.g., United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). Critically, unlike the judgment-of-acquittal context, "[i]n considering [a new trial motion], the court has broad power to weigh the evidence and assess the credibility of . . . the witnesses who testified at trial." *Rothrock*, 806 F.2d at 321, *quoting United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980). *See, e.g., United States v. Dodd*, 391 F.3d 930, 934 (8th Cir. 2004); *United States v. Wilkerson*, 251 F.3d 273, 278 (1st Cir. 2001); *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000); *United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir. 1997). If, after conducting such a review, the district court concludes, in the exercise of its discretion, that the evidence preponderates so heavily against the verdict that a new trial is required in the interests of justice, it may so order. *See, e.g., United States v. Villarman-Oviedo*, 325 F.3d 1, 15 (1st Cir. 2003); *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996).

Moreover, under Fed. R. Crim. P. 29(d)(1), if the defendant has moved for both a judgment of acquittal under Rule 29 and a new trial under Rule 33, the district court *must*, if it grants the motion for judgment of acquittal, "determine whether any motion for new trial should be granted if the judgment of acquittal is later vacated or reversed." Thus, had counsel moved for a new trial at the same time they renewed the judgment-of-acquittal motions on behalf of their clients – or at any time within seven days of the verdict – the Court would have been required, when it granted the defendants' judgment-of-acquittal motions, to determine also whether to conditionally order new trials. If the court were, as it did, to grant the defendants' judgment-of-acquittal motions, then counsel could be reasonably assured that the court would also grant conditional new trials, which

would proceed if the First Circuit reversed the judgments of acquittal. *See* Fed. R. Crim. P. 29(d)(3)(A)("If the court conditionally grants a new trial and an appellate court later reverses the judgment of acquittal, the trial court must proceed with the new trial unless the appellate court orders otherwise").[10]

New trial motions based upon the weight of the evidence must be filed within seven days of verdict; that deadline is jurisdictional, and the district court has no power to act on a new trial motion, other than one predicated upon newly discovered evidence, filed later than seven days after verdict. *See Moran II*, 393 F.3d at 9-10. Reasonably competent counsel would have known of the seven-day filing deadline, *see United States v. Hilliard*, 392 F.3d 981, 985-86 (8th Cir. 2004); *see also United States v. Jiminez Recio*, 258 F.3d 1069, 1074 (9th Cir. 2001), *rev'd on other grounds*, 537 U.S. 270 (2003); *Enoch v. Gramley*, 70 F.3d 1490, 1502 (7th Cir.1995), *cert. denied*, 519 U.S. 829 (1996), and would, under the circumstances of this case, have moved for new trials in addition to judgments of acquittal. Viewed from the perspective of counsel in July, 1999, such a motion would have served two important, alternative, purposes: (1) it would have permitted the Court to grant the defendants a new trial if it determined that the evidence was sufficient under the very restrictive standard applicable to judgment-of-acquittal motions but yet so much against the weight of the evidence that the interests of justice required a new trial, or (2) it would have preserved the defendants' rights to new trials in the event that the Court granted the defendants' judgment-of-acquittal motions but the First Circuit reversed the judgments of acquittal. "Not filing a dispositive motion . . . is a classic dereliction of an attorney's obligation to provide his client with the type of

---

10

Defendants recognize that what the Court would have done in July, 2000, when it granted the defendants' judgment-of-acquittal motions is not, under *Moran I and Moran II*, dispositive with respect to whether the defendants are entitled to relief on the ineffective assistance of counsel claims raised in their §2255 motions. It is, however, extremely relevant when evaluating what counsel should have done in July, 1999, after the verdicts were returned.

performance required by the Sixth Amendment." *Hilliard*, 392 F.3d at 986.

Moreover, there was, under the circumstances of this case, no possible purpose to be served by *not* filing a motion for new trial. "Where . . . an attorney fails to raise an important, obvious defense without any imaginable strategic or tactical reason for the omission, his performance falls below the standard of proficient representation that the Constitution demands." *Prou*, 199 F.3d at 48. *See, e.g., Scarpa*, 38 F.3d at 11 ("Serious errors in an attorney's performance, unrelated to tactical choices or to some plausible strategic aim, constitute substandard performance"). *See also Cirilo-Munoz v. United States*, 2005 WL 858324 (1st Cir. April 15, 2005)(finding ineffective assistance where meritorious claim omitted on appeal). While the First Circuit pointed to several hypothetical reasons why an attorney might move for a judgment of acquittal on behalf of his client but not for a new trial, *see Moran II*, 393 F.3d at 10,[11] the affidavits of the Morans' trial counsel

---

[11]

Whatever validity the hypothetical possible reasoning by counsel posited by the First Circuit may have in other cases, it has none here. Fear that the government may learn from its mistakes and mount a more persuasive case the second time around, *see* 393 F.3d at 10, does not change the fact that, if counsel moved for a new trial and if that motion were granted, there would *be* a second chance for his client which would not otherwise exist. Both sides can learn from the first trial, and it may not be only the prosecution's case which improves from experience. With specific respect to this case, the defects in the government's case identified by counsel in their various judgment-of-acquittal-related pleadings, and particularly those addressed by the Court in its Memorandum and Order granting the defendants' judgment-of-acquittal motions, were largely inherent in the government's evidence – such as the extraordinary weakness of Noke's testimony and of the government's suggested inference that, had John disclosed his financial interests to Noke as he said he did, that disclosure would be documented in the Bank's files – and unlikely of amelioration on retrial. Moreover, more was at stake here than simply the convictions of the clients: there were also licenses to practice law and real estate brokerage to be considered, the clients' retention of which – and thereby their careers and livelihood – would be threatened by their convictions of the offenses charged. Such considerations added substantially to the reasons for seeking new trials as an alternative remedy.

As for fear that the decisionmaker would take a request for a judgment of acquittal less seriously if a possible compromise in the form of a new trial were available, *see* 393 F.3d at 10, such reasoning would require counsel to assume that the district court would act lawlessly and permit a conviction to stand in violation of the Due Process Clause because it found the new trial remedy more palatable. Whether or not a court would consider such a thought process constitutionally acceptable, it was clearly not one engaged in by counsel in this case, who immediately sought to

23

submitted in support of their §2255 motions make it clear that the failure to move for new trials for their clients was "a mere oversight" and *not* "a calculated stratagem." *See id.* at 11. *See also Flores Ortega*, 528 U.S. at 477 (failure to file notice of appeal when instructed to do so by client "cannot be considered a strategic decision"); *Hilliard*, 392 F.3d at 985 (counsel made mistake as to filing deadline for new trial motion); *Kitchen v. United States*, 227 F.3d 1014, 1020 (7th Cir. 2000)(counsel admitted that he failed to file a notice of appeal through inadvertence); *Enoch*, 70 F.3d at 1502-03 (counsel did not know that a new trial motion was necessary in a capital case). The failure to file a motion for new trial was not here the product of tactical or strategic judgment – counsel simply neglected to include the alternative request for relief in their motions filed within seven days of the verdict. Under the circumstances of this case, that failure fell "outside the range of professionally competent assistance," *Strickland*, 466 U.S. at 690, and was unreasonable "under prevailing professional norms." *Id.* at 688.

There was nothing to be potentially gained here by not filing a Rule 33 new trial motion and potentially much to be lost. That counsel's failure to so move was not the result of a strategic or tactical judgment is eloquently attested by the fact that counsel for both John and Nora sought an alternative new trial remedy as soon as they realized the mistake which had been made. In his Memorandum of Defendant John M. Moran in Support of His Renewed Motion for Judgment of

_____

rectify their oversight when they became aware of it. *See* pages 19-20, *supra.*

In addition, counsel deciding to move only for a judgment of acquittal on behalf of his client must have also decided to run the risk, should the district court grant a judgment of acquittal, that the government would appeal and that the First Circuit would reverse the judgment of acquittal, in which event, barring other reversible error on appeal, the convictions would be reinstated. Here, given the length of the trial and the tenaciousness with which the government prosecuted the Morans, counsel could have had little doubt that the government would appeal if the Court were to grant judgments of acquittal. Sound judgment would militate against leaving a criminal defendant's fate wholly in the hands of the First Circuit if an alternative such as a conditional grant of a new trial were, as here, available.

Acquittal, filed on September 15, 1999, at page 21, Mr. DiMento requested that John alternatively be granted a new trial. On the same date, Mr. Fishman filed a Supplemental Memorandum in Support of Defendant Nora Moran's Motion for Judgment of Acquittal and/or Motion for a New Trial, which included an alternative request for a new trial both in the caption and in the body of the motion, as well as argument why the Court could consider the new trial request even though it was not made within seven days of verdict. These were not the acts of counsel who had made a strategic judgment that their clients' interests would most likely be best served by putting all their eggs in the judgment-of-acquittal basket. Quite the contrary – they are they acts of counsel who, as they have attested in their affidavits, discovered that they had inadvertently erred in omitting a new trial request from their post-verdict filing and sought to remedy their error.

John and Nora Moran have, accordingly, met their burden to show that their counsel's failure to move for new trials in the alternative to judgments of acquittal "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. As the next section will demonstrate, that failure prejudiced both of the defendants, and they should be granted new trials because of the constitutionally ineffective assistance of their trial counsel.

> **2.     There is a reasonable probability that had counsel moved for a new trial in the alternative to judgments of acquittal, the outcome of the proceeding would have been different, and both John and Nora Moran would have been granted new trials.**

The prejudice inquiry in this case centers on the question whether "but for the error, the moving defendant probably would have received a new trial." *Moran II*, 393 F.3d at 11. To be entitled to relief, John and Nora Moran "must independently demonstrate that, given the holding of [the First Circuit] in *Moran I*, an objectively reasonable district court would likely have granted a new trial." *Id.* This they will now do.

As implicitly recognized in *Moran II*, there is nothing in either *Moran I* or *Moran II* which

forecloses a finding that there is a reasonable probability that, but for counsel's failure to move for

a new trial, both John and Nora Moran would have been granted new trials. Given the differences

between the standards for evaluating the sufficiency of the evidence under Rule 29 and Rule 33, the

First Circuit's holding that the Court erred in entering the judgments of acquittal does not foreclose

new trial relief. As the Ninth Circuit has explained under somewhat similar circumstances:

> Here, the motion for new trial was not before the *Kellington I* court. Only the judgment of
> acquittal was appealed and addressed by our decision. Moreover, there can be no implication
> that, in reversing the judgment of acquittal, the *Kellington I* court implicitly disposed of the
> motion for a new trial. . . . As with any judgment for acquittal, the *Kellington I* court
> reviewed the sufficiency of the evidence in the light most favorable to the government. . . .
> A motion for new trial, by contrast, is reviewed for abuse of discretion on appeal, and a
> district court's power to grant a motion for new trial is much broader than its power to grant
> a motion for judgment of acquittal. The district court need not view the evidence in the light
> most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself
> the credibility of the witnesses.

*Kellington*, 217 F.3d at 1094-95 (internal quotation marks omitted). *See, e.g., Autuori*, 212 F.3d at

120-21 (upholding grants of new trial as to counts on which appellate court found the evidence to

be sufficient to support the convictions); *United States v. Campbell*, 977 F.2d 854, 860 (4th Cir.

1992)(reversing judgment of acquittal but upholding grant of new trial), *cert. denied*, 507 U.S. 938

(1993); *United States v. Huerta-Orozco*, 132 F.Supp.2d 763, 776 (N.D.Iowa)(denying judgment of

acquittal but granting new trial motion based on the weight of the evidence), *aff'd*, 272 F.3d 561 (8th

Cir. 2001); *United States v. Shankman*, 13 F.Supp.2d 1358, 1363 (S.D.Ga. 1998)(same), *aff'd*, 190

F.3d 541 (11th Cir. 1999).

In *United States v. Hilliard*, 392 F.3d 981 (8th Cir. 2004), the district court denied the

defendant's motion for judgment of acquittal at trial, and counsel failed to file a timely Rule 33 new

trial motion. The defendant brought a §2255 motion arguing that counsel's failure to file a timely

new trial motion constituted ineffective assistance of counsel; the district court granted the motion,

and the government appealed. In rejecting the government's argument that the district court erred

26

in granting the defendant a new trial because the evidence was sufficient to support his conviction,

the Court stated:

[T]his argument evinces a misunderstanding of the analysis undertaken in new trial motions. In granting relief to Hilliard, the district court did not take issue with the *extent* of the government's evidence; it found problems with the *quality* of the evidence. Certainly, the government's evidence was strong enough to withstand a motion for judgment of acquittal, where the district court does not weigh evidence or consider the credibility of witnesses. . . . But in a new trial motion, the district court is to weigh the evidence and evaluate for itself the credibility of the witnesses. The motion may even be granted when there is substantial evidence to sustain the verdict. . . . The district court presided over Hilliard's trial, and had a first-hand opportunity to judge the credibility of the government's witnesses. It was the district court's prerogative to find the testimony of Baskerville and James so unreliable that a conviction based on that testimony could not stand and, after independently reviewing that testimony, we find no error in the  district court's conclusion.

*Id.* at 987-88 (emphasis in original; internal quotation marks omitted). Thus, the fact that the First

Circuit has concluded that the evidence sufficed to support the verdicts does not foreclose new trial

relief based upon the weight of the evidence.

Moreover, the First Circuit left it to this Court to determine whether an objectively reasonable

district court would have granted a new trial had timely new trial motions been filed.[12] In so doing,

the Court relied upon its general rule that it will not consider fact-specific ineffective-assistance-of-

counsel claims raised for the first time on appeal and that such claims must first be presented to the

district court. *See* 393 F.3d at 10. That rule is not, however, inviolable, and the Court has considered

ineffective-assistance-of-counsel claims raised initially on direct appeal where it found the record

sufficiently developed to permit it to do so. *See, e.g., United States v. Derman*, 211 F.3d 175, 184

(1st Cir. 2000); *United States v. Ortiz*, 23 F.3d 21, 26-27 (1st Cir. 1994); *Natanel*, 938 F.2d at 309.

*See also Scarpa*, 38 F.3d at 15 (deciding prejudice issue on appeal rather than remand to the district

---

12

Moreover, the First Circuit indicated that this Court's view of the evidence "may" be different in light of the opinion in *Moran I*; it did not say that the Court's view should, or necessarily would, be different. *See* 393 F.3d at 11 n.6.

court). Both John and Nora Moran urged the Court to decide the issue on direct appeal. While the reasons why counsel did not file timely new trial motions and hence, whether counsel's performance in failing to file the motions was defective, is a matter which, as the Court indicated, needs factual exploration in the district court, there is no requirement that a court determine the performance element of the *Strickland* standard before deciding the prejudice element; if there was no prejudice, a court may deny relief without determining whether counsel's performance was in fact deficient. *See, e.g., Strickland*, 466 U.S. at 697; *Gonzalez-Soberal v. United States*, 244 F.3d 273, 277-78 (1st Cir. 2001). Thus, had the First Circuit been of the opinion that, whatever the reason why counsel had failed to file timely new trial motions, no objectively reasonable district court judge would have granted them, it was open to it to decide the prejudice issue itself based on the trial record, which it had before it. However, it did not. Instead, in declining to decide the issue on direct appeal, the Court noted that "the insights of the trier, who has seen and heard the witnesses at first hand and watched the dynamics of the trial unfold, are often of great assistance." 393 F.3d at 10. It also noted that the question whether the defendants were prejudiced by the lack of timely filing "is not open and shut." *Id.* at 11.

### a. Counts Two and Three: John Moran.

The government's weeks upon weeks of evidence notwithstanding, the question of John Moran's guilt of the conspiracy and substantive bank fraud charges against him came down to a single question: did he or did he not disclose to Noke his financial interests in the Puente/Boersner loans as he said he did?[13] The conclusion that he did not, which the First Circuit found the evidence

---

13

As the Court noted, the government presented no evidence that John knew that he had any duty of disclosure beyond providing the information to Noke. Memorandum and Order at 33 n.7. Moreover, as the Court also noted, Ragalevsky testified that "given the ongoing business relationship between John Moran and Noke, Moran would have been justified in assuming that any disclosure he made to Noke fully discharged [his] disclosure obligation to the Bank. *Id.*

sufficient to permit, rests on two (at best) exceedingly weak premises: one, that, had John disclosed his financial interests to Noke, as John said he did, there would have been documentation to that effect in the Bank's files relating to the Puente/Boersner loans, and two, that Noke's complete failure of independent memory as to whether John disclosed his interests somehow provides affirmative evidence that John did not make the disclosure because, had he done so, the circumstances were sufficiently unusual that Noke would likely have remembered it. The evidence on these points preponderates so heavily against the jury's verdict that John Moran should be granted a new trial in the interests of justice. Failure to grant a new trial will perpetuate the miscarriage of justice which occurred in this case.

### i. the lack of documentation in the bank's files.

In 1986, First American was, as a result of its initial public offering, flush with more than $100,000,000, which, despite the almost total lack of competence of its officers in matters concerning commercial loans, it was eager to invest in the booming real estate market of the time. It processed a huge volume of loans with astounding rapidity – acting on more than $50,000,000 in loans in December, 1986, alone, *see* Ex. 30 – with little care and less investigation. Under such circumstances, it is hardly to be wondered that the Bank's loan files were – as expert bank examiners found and as this Court has noted – seriously defective in the quantity and quality of the documentation which they contained. Yet John Moran's convictions rest in large measure on the absence of documentation in the files of a bank notorious for its shoddy recordkeeping and the incompetence of its loan officers. This is not justice.

As this Court has found, Noke's direct examination testimony that John did not disclose to him his financial interests in the Puente/Boersner loans rests entirely upon assumptions which he made after reviewing the Puente/Boersner loan documents, as well as other documents, shown to

him by the government. Because those documents did not include any notes, memoranda, or other documentation prepared by him referencing the disclosure, he simply assumed that disclosure had not been made. There was no factual basis for his assumption, as his failure of memory regarding the Puente/Boersner loan transactions was profound and all-encompassing.

This Court is already well aware of the manifest deficiencies in the Bank's recordkeeping practices both in general and with respect to the Puente/Boersner loans in particular, which it has accurately termed "incomprehensibly bad." *See* page 16, *supra.*[14] While an inference that something did not happen based upon a lack of documentation of the event in records demonstrated to have been at all times meticulously kept and maintained in accordance with established patterns and practices might, under some circumstances, be entitled to considerable weight, that is far from the case we have here. Quite the contrary – what we have here is compelling evidence that a number of significant events unquestionably occurred in the life of the Puente/Boersner loans regarding which there should have been, and in the normal course would have been, documentation in the loan files, but there was not.[15] For example, Noke met with Moran and with the borrowers,[16] yet there was nothing in the file to so indicate. Similarly, Noke also visited the sites of both proposed projects,[17]

---

14

Notably, the First Circuit did not take issue with any of this Court's factual discussion regarding the Bank's deplorable recordkeeping practices, disagreeing only with its ultimate conclusion regarding the sufficiency of the evidence.

15

When Hanson reviewed the Bank's files regarding the Puente/Boersner loans in early 1988, he found that the files contained very little in the way of documentation regarding the loans. Memorandum and Order at 27.

16

Noke had no memory of such a meeting but acknowledged that it would have been his normal practice to meet with the borrowers before making a loan. Tr.20:20-21.

[17]Noke also had no memory of the site visit, but, once again, acknowledged that it would have been his normal practice to visit the site prior to a loan closing. Tr.20:21-22.

Tr.18:111, 26:63-65, but one would have had no idea from his file that he had done so. Most strikingly, there was nothing in the file to explain how the original $9.75 million loan request with respect to the Commonwealth Avenue properties metamorphosed into a $12 million loan. Tr.11:45-46; *compare* Ex. 26A (loan proposal), *with* Ex. 29 (Noke memorandum to Executive Committee recommending $12 million loan). There was no documentation in the file showing where the money went, which Ragalevsky testified he would have expected to find in a bank file relating to a loan; such documents would have been Noke's responsibility. Tr.4:76-78. One document which did exist was the report regarding the Puente/Boersner loans which Noke prepared for the Executive Committee's consideration, but Noke freely acknowledged that he would not have referenced either John's brokerage fee or his potential profit participation in such a report had he known of them. Tr.20:82-83.

As to the lack of other documentation, Noke testified that the Bank required that monthly reports of "insider" loans be submitted and that he had not listed either the Commonwealth Avenue or West Rutland Square loans in any such reports. Tr.20:35. This testimony was no more than another assumption predicated upon the absence of documentation, Tr.20:105; the fact of the matter, however, is that the government did not have the insider loan reports for October to December, 1986, the period during which any such reporting would have been done – or for any other period during the life of the Bank, for that matter – presumably because they too were not in the bank's files. It is, therefore, hardly surprising – and is certainly not inculpatory – that Noke did not see any reference to the Puente/Boersner loans on any monthly insider loan reports. Given Noke's complete lack of independent memory, his testimony regarding the monthly insider loan reports is essentially meaningless.

While the jury was, as the First Circuit concluded, entitled to consider the lack of any

31

documentation of John's disclosure in the Bank's records, any inference that John did not disclose his financial interests in the Puente/Boersner loans to Noke to be drawn from the absence of documentation of the disclosure must be regarded as exceedingly weak, given the Bank's indisputably deplorable recordkeeping practices. Any such inference is weakened even further by Noke's self-acknowledged incompetence as a commercial lender, Tr.20:11, 68, seconded by the scathing assessments of his performance offered by others, including Ragalesky and Hanson, and Noke's candid admission that he suffered from a severe alcohol abuse problem during the relevant time frame, a problem which led to his termination from the Bank in April, 1987. Tr.20:50-51, 65.[18] And it is weakened even further still by the complete absence of evidence regarding the care, custody, and maintenance of the Bank's records from October, 1986, through early 1988, a serious defect in the government's case addressed by the Court in ruling on the defendants' judgment-of-acquittal motions.

That it would be a miscarriage of justice to permit John's convictions to stand based upon the absence of documentation in the Bank's files indicating that he made the disclosures that he said he did only becomes more evident when documents which *did* exist are considered, most importantly, the loan proposals. *See* Ex. 26-A, 26-B. As the Court noted, the name "Moran" appeared four times on the cover page of each proposal:

> It first appears in a line captioned "**Marketing**." In that line, The Moran Company (Nora Moran's real estate firm) is listed as one of two entities designated to market the condominium development. Another line is headed as follows:

---

18

    Noke's negligence in matters relating to loan proposals was a matter of complaints sufficiently serious as to cause the president of the Bank to address the matter with him. Tr.20:64-65. Noke apparently himself attributed his inattention to the interests of the Bank to his drinking problem, as it was this conversation which prompted him to reveal his drinking problem to the Bank's president. *See* Tr.20:65. Nora Moran had made complaints about Noke's performance as early as the summer of 1986. Tr.20:109-111.

**Prepared By:** Moran Holdings
303 Congress Street
Suite 300
Boston MA 02210

. . . . Finally, on the cover page of each proposal, the signature line shows "Moran Holdings,"
below which there appears a signature line. . . . Below the signature line appears the typed
name "John M. Moran." . . . The proposal for the Commonwealth Avenue project is not
signed, but the proposal for the West Rutland Square Project bears the written signature
"John M. Moran."

Memorandum and Order at 46.[19] *See* Tr.20:26-27, 92-93. In addition, John brought the buyers to

meet with Noke, and John and Nora were both present at the site visit. All of this is conduct flatly

inconsistent with the government's efforts to portray John's and Nora's conduct as sneaky and

clandestine and provides inferential support for the proposition that John did, as he testified, disclose

his interests in the Puente/Boersner loans to Noke. *See* Memorandum and Order at 50. Based on the

evidence presented by the government, there can be no real confidence that Noke would actually

have carried out his responsibility to document John's interest in the loans if disclosure was made

or that the Bank would have properly maintained the documents if he had, as witness the complete

absence of any monthly insider loan reports.

### ii.    Noke's lack of memory.

As he freely admitted, Noke had absolutely no independent memory regarding any aspect

of the Puente/Boersner loan transactions. He did not remember the loan, Tr.20:72, or any meeting

with the borrowers, Tr.20:20, 72, or any meeting with John Moran, who he did not even recognize

in the courthouse corridor, *id.*, or any visits to the property, Tr.20:21, or the property involved,

Tr.20:21, 22, 81, or anything that Moran or the borrowers may have told him during any meetings

---

[19]

These loan proposals, with the name Moran so prominently evident, were submitted to the
Bank's Executive Committee along with Noke's memoranda regarding the loans. Memorandum and
Opinion at 49 n.14.

with him or what he may have told them, Tr.20:72-73, or from whom he had received the loan proposals, Tr.20:24. He did not even really remember John Moran. Tr.20:72. In sum, he did not "remember anything about the deal period." Tr.20:104. *See also* Tr.20:72. The First Circuit said that, given the unusual nature of the transactions, the jury could infer from Noke's lack of memory that John had disclosed his financial interests in the Puente/Boersner loans to him that John had not in fact made the disclosure. In the wake of *Moran I*, we must, of course, accept that, as the First Circuit ruled, such an inference may, at least when coupled with the lack of documentation and Collins' similar failure of memory regarding the other disclosure regarding which John testified, suffice to defeat a Rule 29 motion. That does not, however, end the inquiry as to whether there was a reasonable probability that the Court would have granted John a new trial in the interests of justice based upon the weight of the evidence, for, unlike the Rule 29 context, the district court, in ruling on a Rule 33 new trial motion may weigh the evidence and assess the credibility and demeanor of the witnesses who appeared before it. *See* page 21, *supra.*

Like any inference to be drawn from the absence of documentation of the disclosure in the Bank's files, any inference that Noke would have remembered the disclosure had it taken place because of the unusual circumstances is, although permissible, quite weak for a number of important reasons. First, the combined total of the two loans was *$17 million*, a substantial percentage of the entirety of the $100 million which the Bank had to loan out. *See* Tr.2:28. The executive committee approved 153 loans in December, 1986, which strongly suggests that the Puente/Boersner loans were, in the Bank's scheme of things, and certainly Noke's, enormous, and of a magnitude far surpassing that of the average loan made during this period. Yet Noke remembered nothing whatsoever about the loans, despite the fact that he was, at the time the loans were made, new to the commercial loan arena, and one would expect that being entrusted with two construction loans

34

totaling $17 million would be a memorable experience in itself.

Second, Noke did not testify that John's financial interests would have been so out of the ordinary for someone who was also acting as the Bank's attorney with respect to the loans that he would have remembered had he been informed of them. Even if others might have regarded the dual role as unusual – and there was evidence that it was not so unusual at all[20] – what matters for purposes of the strength of the inference is the perception which *Noke* – a newcomer to the world of commercial lending – would have had at the time. Unless *Noke* would have regarded John's financial interests in the loans as strikingly unusual, any inference that he would have remembered the disclosure more than twelve years later because of its unusualness must be regarded as a weak one.

Third, Noke did not remember *anything* about the loans, including events which indisputably occurred, such as his meeting with Puente and Boersner and his visits to the properties, which must weaken any suggestion that, because he did not remember something happening, it must not have happened. Fourth, the Bank's requirement of monthly reports listing all "insider" loans indicates that the practice was simply not that rare. Fifth, it must be remembered that Noke was drinking heavily during the relevant period, which it would be reasonable to infer affected his ability to remember, and was, as a result of his drinking, inattentive to Bank affairs to the extent that there were complaints about his performance. Sixth, Noke was testifying more than twelve years after the fact.

[20]

Stanley Ragalevsky testified on direct examination that it was not uncommon in the 1980s for a bank to allow an attorney to represent it in a closing even though the bank knew that the attorney represented, or had a special relationship with, the borrower. Tr.3:12. In fact, this was something that "often" occurred in the 1980s. Tr.4:114. Noke himself testified that an attorney named McDevitt had been permitted to represent both sides of loan transactions in which the Bank was the lender. Tr.20:112. Even when pressed by the government regarding his lack of memory regarding a conversation with Moran regarding a $200,000 commission to be paid to Moran in relation to a loan to be made by the Bank, Collins was unable to say that the conversation was something he would have remembered had it occurred. Tr.30:82-83.

35

### iii.    other evidence.

Under *Moran II*, the Court, in determining whether there is a reasonable probability that an objectively reasonable decisionmaker would have granted timely-filed new trial motions, must consider the evidence presented by the defendants and the evidence presented by the government in rebuttal. Nothing in that evidence detracts from the conclusion that the weight of the evidence preponderates so heavily against the verdicts as to require new trials in the interests of justice and that there is a reasonable probability that, had Rule 33 new trial motions been timely filed, they would have been granted.

With respect to the testimony of John Moran, what is most noteworthy about the *Moran II* opinion is the fact that, while the First Circuit pointed to Collins' rebuttal testimony as a possible basis on which the jury could have rejected John's testimony and instead have believed that of Noke, at least when coupled with the jury's first-hand ability to evaluate Moran's demeanor on the stand and the absence of independent corroboration for John's testimony regarding having disclosed his financial interests in the Puente/Boersner loans to Noke, *see* page 11, *supra*, the Court did not specifically identify any aspects of Moran's testimony which it regarded as suspect. This Court had the same first-hand ability to evaluate John's demeanor and credibility as did the jury – a power which an objectively reasonable decisionmaker may exercise in determining whether there is a reasonable probability that a new trial based upon the weight of the evidence would have been granted, as well as one which the First Circuit expressly indicated that this Court should exercise – and has already decided that it could not find even by a preponderance of the evidence that John committed perjury during his testimony. While the First Circuit adverted to the absence of independent corroboration of John's testimony that he had disclosed his financial interests to Noke, it must first be remembered that John, as the defendant in the case, had no burden to present

evidence at all. It was for the government to prove that John did *not* disclose his interest in the Puente/Boersner loans to Noke, and its evidence on this crucial – indeed, outcome-determinative – issue was, although sufficient to survive a Rule 29 motion, very weak.

Moreover, consideration of the lack of independent corroboration that John disclosed his interests in the transactions to Noke, while permissible under *Moran I*, is not without a certain element of unfairness, given the fact that the government did not indict John, nor did he even have notice of the pendency of a criminal investigation regarding the Puente/Boersner loans, until virtually ten years after the events at issue, *see* Tr.26:18-19, and that during the intervening years many of his files were discarded, damaged, or destroyed, including the files relating to the Puente/Boersner loans. *See* Tr.26:14-16, 17-18. John testified that his files characteristically would contain, among other things, notes, jottings, or scribbles regarding events which occurred in the course of the transaction to which the file pertained. Tr.26:20-21, 75; Tr.29:47. Among the matters which he jotted down with respect to the Puente/Boersner loans was his disclosure to Noke. Tr.28:83; Tr.29:47-48. Had the preindictment delay in this case not been so extreme, John's Puente/Boersner loan files might have been available, and we would know whether there was in fact independent corroboration, in the form of a contemporaneous note by John, of his testimony that he had disclosed his interests to Noke. If, as John testified, such a file note existed, but was no longer available by the time he became aware of the criminal investigation because the files had been discarded because of their age or lost or destroyed through subsequent moves and damage to his files, then the government's delay in the institution of this prosecution deprived John of his ability to present the very independent corroboration on the absence of which the First Circuit commented.

The rebuttal testimony of William Collins stood on no firmer foundation than that of Noke. Collins retired from the Bank in December, 1986, and was 76 years old at the time of his testimony.

Tr.30:74. The events about which the government questioned him occurred *thirteen* years earlier. Collins had absolutely no independent memory of the transaction in question; his testimony, like Noke's, was based solely on assumptions he had made based on the bank documents that the government had shown him. Tr.30:87-89. Indeed, so complete was his lack of independent memory that the Court sustained defense objections to a series of questions posed to Collins by the government regarding what he recalled regarding the transaction in which Moran received a $100,000 consulting fee, which was clearly indicated on the HUD settlement statement. *See* Tr.30:87-90. Also like Noke, Collins had severe substance abuse problems in 1986, which he admitted had "a lot to do" with his failure of memory regarding events in 1986. Tr.31:35-36. Collins also admitted that he would not necessarily have remembered having made the statement to John regarding John's loss of a $200,000 commission to which John testified. Tr.30:82-83.

Because of his wholesale lack of memory, Collins' testimony cannot even fairly be regarded as rebuttal testimony. *See* Tr.30:87-88. He added nothing more to the government's case than another witness who did not remember something which John testified occurred. In the absence of evidence that the conversation in question was one which the witness would have remembered had it occurred – which the government did not even seek to establish as to Noke, *see* page 35, *supra*, and which Collins expressly said was not the case – the fact that neither witness, both of whom suffered from severe substance abuse problems at the relevant time, both of whom were being asked to remember events which had occurred thirteen years earlier, and neither of whom had any independent memory of the transactions in question, remembered conversations which John testified occurred is entitled to little weight.

It is also noteworthy that the remainder of the evidence with respect to John discussed by the First Circuit in *Moran I*, *see* page 12, *supra*, was addressed by the Court, not in the context of

38

evidence regarding whether John disclosed his interests to Noke, but instead as evidence from which the jury could conclude that John's nondisclosure, which the Court concluded the jury could find based upon the Noke/Collins testimony, was intentional rather than negligent. As such, that evidence has little relevance to the question whether there is a reasonable probability that an objectively reasonable decisionmaker would have concluded that the evidence that John did not make the disclosure to Noke was so weak as to require a new trial in the interests of justice, even though it sufficed to survive a judgment-of-acquittal motion.

For all these reasons, had John Moran's counsel filed a timely new trial motion on his behalf, there is a reasonable probability that an objectively reasonable decisionmaker would have granted it and, therefore, a reasonable likelihood that the result of the proceedings would have been different. He was, accordingly, prejudiced by his counsel's failure, and the second half of the *Strickland* standard has, therefore, been satisfied.

### b.    Counts Two and Three: Nora Moran

The First Circuit expressed itself in complete agreement with this Court regarding the bankruptcy of the primary theory of culpability which the government pursued at trial as to Nora Moran, *i.e.*, that she voted to approve the Puente/Boersner loans at the board meeting on January 15, 1987. *See Moran I*, 312 F.3d at 492. The Court did, however, conclude that the evidence was sufficient to survive a Rule 29 judgment-of-acquittal motion based upon one of two alternate grounds: first, that Nora also executed the fraudulent scheme charged, and second, that Nora aided and abetted John in his conduct of the fraudulent scheme charged. *See* pages 13-14, *supra.* Two essential predicates of both of these theories are that John did not disclose his financial interests in the Puente/Boersner loans to Noke and that Nora knew that he had not done so. As to the former, the weaknesses of the government's evidence regarding whether John disclosed his interests to Noke

are directly related to the question of Nora's potential criminal culpability – if John disclosed his interests, *then there was no fraudulent scheme for Nora either to participate in or to aid and abet.* As the preceding section has demonstrated, the evidence regarding whether John disclosed his financial interests in the Puente/Boersner loans to Noke preponderates so heavily against the verdict as to require that John be granted a new trial in the interests of justice. From that conclusion, it necessarily follows that the evidence regarding whether John disclosed his financial interests in the Puente/Boersner loans to Noke preponderates so heavily against the verdict as to require that Nora also be granted a new trial in the interests of justice and that there is a reasonable probability that an objectively reasonable decisionmaker would have so determined had a Rule 33 new trial motion been timely filed on Nora's behalf. Indeed, one objectively reasonable decisionmaker has already weighed in on the question: it is apparent from Judge Boudin's concurring opinion in *Moran I* that he believed that this Court would have been warranted in granting Nora a new trial if it were jurisdictionally permissible to do so in light of her belated new trial request. *See* pages 14-15, *supra.*

As to the second essential predicate, that, if John did not disclose his interests to the Bank, Nora knew that he had not done so, Judge Boudin quite correctly described the government's evidence as "extremely thin." *Moran I*, 312 F.3d at 495. As Judge Boudin more fully reasoned:

   To sustain the jury's verdict as against the district court's judgments of acquittal, one must rely on the government's alternative arguments. Under one theory, Nora failed (as a fiduciary) to reveal her husband's double dealing and therefore committed fraud by that non-disclosure; under the (sounder) aiding and abetting version of the theory, she also took positive steps – such as signing the papers to establish the business trust that was used to conceal the Morans' interest in the loans – to further John's fraud. In either case, it was necessary for the bank fraud conviction to prove that Nora acted with *intent to defraud.* . .

   This culpable state of mind with respect to Nora depends on proving four facts: first, that Nora knew of John's participation on both sides of the transaction; second, that she knew that John had not disclosed his conflict of interest to the bank; third, that she knew that she had an obligation to disclose John's position if John did not make the requisite disclosure; and fourth, that she acted dishonestly rather than negligently in failing to disclose. *The second condition is doubtful and, if the second fails, the fourth (which depends on the other*

40

*three) also is infirm.*

* * * *

On the second condition – that Nora knew of John's failure to disclose – *the government's evidence is extremely thin. Clearly such a factual predicate is essential: it would be quite a stretch to hold Nora* criminally *liable for failing to make an independent disclosure to the bank, even though she believed that John* had *disclosed his interest in the project.* The only evidence as to whether John told her he had disclosed his interest to the bank is Nora's claim that he said he had. . . .

Of course, the jury may have disbelieved her statement, made after the fact to bank attorneys investigating the Morans' involvement with the loans as a *post hoc* attempt at exculpation. *It is not clear what basis the jury would have had for such a rejection.* John certainly could have made such a statement to his wife, truthfully or not; and Nora did not testify at trial so her demeanor was not subject to assessment. Still, the jury could simply not have believed Nora's statement.

*Moran I*, 312 F.3d at 495-96.[21] Thus, even if John did not disclose his financial interests in the

Puente/Boersner loans to Noke, the evidence that Nora knew that he had not done so, in the absence

of which knowledge she could not be convicted of the offenses charged, so heavily preponderates

against the verdicts that there is a reasonable probability that an objectively reasonable

decisionmaker would have granted Nora a new trial had a Rule 33 new trial motion been timely filed

on her behalf.

Also relevant to the new trial inquiry is the unfairness inherent in the government's primary

reliance throughout the trial and in its closing argument on a theory of culpability as to Nora which

was, in the words of Judge Boudin, "hopeless." *Id.* at 496. Given the vigor with which the

government urged the jury to convict Nora Moran based upon a theory for which there was in fact

no factual support, there is no guarantee that the jury ever considered whether it could find beyond

a reasonable doubt either that Nora had herself knowingly and intentionally executed the fraudulent

---

21

The emphasis in the first paragraph is in the original; the emphasis in the second paragraph is added; the emphasis in the third paragraph is added except that the emphases within the portion to which emphasis was added are in the original; the emphasis in the fourth paragraph is added.

scheme or that she had knowingly and intentionally aided and abetted John's fraudulent scheme or even whether John had or had not told her that he had disclosed his interests to the Bank. Moreover, the government argued to the jury that Nora had an independent duty of disclosure based upon which it could find her guilty of the offenses charged in Counts Two and Three if she had not disclosed the interests in the Puente/Boersner loans, even if she knew or believed that John had in fact disclosed the interests to Noke. *See* Tr.32:52-54; Tr.33:46-47, 56-57. This, too, as Judge Boudin noted, would have been an impermissible basis for conviction of Nora on Counts Two and Three. Thus, the jury was presented by the government with not one, but two, theories which could not support Nora's conviction on Counts Two and Three. Fundamental fairness and the interests of justice dictate, given the extreme thinness of the evidence against her, that Nora should be afforded a new trial at which she will have the opportunity to defend herself against – and at which the jury's attention will be focused on – only those theories of culpability identified in the majority and concurring opinions in *Moran I* as potentially tenable as a matter of fact and of law.

This is especially true in light of the considerable evidence which supports Nora's innocence of the offenses charged. While, as Judge Boudin noted, the jury could have disbelieved Nora's statement to Ragalevsky and Adams that John told her that he had disclosed his interests to the Bank (although Judge Boudin expressed considerable skepticism as to whether there was any rational basis for it to do so), there is no direct evidence that John did not in fact tell her that he had done so. Moreover, as discussed in the preceding section, the loan proposals submitted to the Bank by John prominently and repeatedly bore the name Moran. Those proposals specifically indicated that the condominiums to be developed would be marketed by Nora's real estate firm. *See* pages 32-33, *supra.* Nora openly visited the sites of the proposed developments with Noke, the borrowers, and her husband, conduct antithetical to an intent to conceal. There was no evidence that Nora knew the

42

purpose for the formation of the MDG Trust which was ultimately designated by John as the repository of his interest in the anticipated profits to be generated by the two projects. The trust documents that Nora signed said nothing of the two properties, *see* Ex. 28, nor did Nora sign any documents relating to the Puente/Boersner loans or the properties themselves on behalf of the MDG Trust. *See* Tr.12:8-13; Exs. 35, 41, 61.[22]

Had a timely Rule 33 new trial motion been filed, there is more than a reasonable probability that an objectively reasonable decisionmaker would have granted Nora Moran a new trial on Counts Two and Three. Nora was, therefore, prejudiced by her counsel's failure to file a timely Rule 33 new trial motion on her behalf, as, had he done so, there is a reasonable likelihood that the outcome of the proceedings would have been different. Nora has, therefore, satisfied the second half of the *Strickland* standard as well.

### c.    Count One: John and Nora Moran

There is also a reasonable probability that, had a Rule 33 new trial motion been timely filed, both John and Nora Moran would have been granted new trials as to Count One, which charged them with conspiracy to commit bank fraud. For all the reasons addressed in the preceding sections, the evidence regarding whether John and Nora entered into a conspiratorial agreement to execute a scheme to defraud the Bank in conjunction with the Puente/Boersner loans preponderates so heavily against the verdict as to require that a new trial be granted in the interests of justice. They were,

---

22

    The "sharing of financial matters" between John and Nora to which the First Circuit pointed, 312 F.3d at 492, is largely chimerical. The filing of joint tax returns is hardly an unusual occurrence for married couples and provides no support for the proposition that the financial dealings of one spouse which were reported in the returns bore any relationship to the reported financial dealings of the other. While the government did present evidence of certain transfers of funds between the accounts of John and Nora, they were minimal in frequency and amount and the purposes for which they were made were not indicative of a financial interrelationship between their respective businesses.

43

therefore, prejudiced by their counsel's failure to file timely new trial motions, as, had counsel done so, there is a reasonable likelihood that the result of the proceedings would have been different.

## CONCLUSION

For all the foregoing reasons, this Court should hold a hearing on John and Nora Moran's §2255 motions and, after hearing, should grant those motions, vacate their convictions, and order new trials for both defendants on all counts.

Kimberly Homan
Mass. Bar. No. 239000
20 Park Plaza, Suite 905
Boston MA 02116
(617) 227-8616

Respectfully submitted,
By his attorneys,

Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 905
Boston MA 02116
(617) 227-3700

## CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 23rd day of May, 2005, I served one copy of the foregoing Memorandum, along with one copy of the motions of John and Nora Moran pursuant to 18 U.S.C. §2255, by hand, on Duty Attorney, AUSA, United States Attorneys Office, Moakley United States Courthouse, 9th floor, 1 Courthouse Way, Boston, Massachusetts 02210.

Kimberly Homan